# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DURRELL SIMS,**

      **Plaintiff,**

**vs.**                                          **Case No. 4:16cv49-WS/CAS**

**JULIE L. JONES,**
**SECRETARY, FLORIDA**
**DEPARTMENT OF CORRECTIONS,**

      **Defendant.**

_____/

## THIRD REPORT AND RECOMMENDATION[1]

Plaintiff, a prisoner proceeding pro se, filed a civil rights complaint

asserting claims under the First Amendment and under the Religious Land

Use and Institutionalized Persons Act (RLUIPA).  ECF No. 1.  After the

close of discovery, Plaintiff filed a motion for summary judgment, ECF No.

42, as did the Defendant, ECF No. 47.  A Report and Recommendation

---

[1] The first Report and Recommendation, ECF No. 25, concerned Defendant's motion to dismiss, ECF No. 20.  The recommendation was adopted and the motion to dismiss was denied.  ECF No. 28.  A Second Report and Recommendation, ECF No. 61, was entered concerning Defendant's motion for summary judgment, ECF No. 47, and Plaintiff's motion for summary judgment, ECF No. 42.  That recommendation was granted in part and this case was remanded.  ECF No. 63.

was entered March 1, 2018, recommending that Defendant's summary judgment motion, ECF No. 47, be granted as to Plaintiff's First Amendment claims, denied as to the RLUIPA claims, and that Plaintiff's motion, ECF No. 42, be granted on those claims and this case be remanded for further proceedings prior to fashioning an injunction on the RLUIPA claims. ECF No. 61. Senior United States District Judge William Stafford adopted that recommendation in part, granting summary judgment in favor of Defendant on the First Amendment claims, but deferring ruling on Plaintiff's summary judgment motion and remanding this case for further proceedings. ECF No. 63.

That Order noted that Defendant's objections, ECF No. 62, included "a request - buried in two footnotes - that she now be given an opportunity to file a renewed motion for summary judgment . . . ." *Id.* at 4. Although the request was late and second bites at the apple are not routinely granted, Judge Stafford permitted the request to be considered by the undersigned upon remand. ECF No. 63 at 4. Defendant was then permitted to file a renewed motion, supported by evidence, and limited to the two remaining RLUIPA claims. ECF No. 64; *see also* ECF No. 67.

Defendant's renewed motion for summary judgment was filed on May 22, 2018, ECF No. 68, and Plaintiff's response was timely filed on July 11, 2018. ECF No. 73. At issue are two rules of the Florida Department of Corrections which concern the permissible length of an inmate's beard and the manner in which searches are conducted. Defendant contends the rules do not violate the Religious Land Use and Institutionalized Persons Act (RLUIPA) because they are the least restrictive means of furthering a compelling governmental interest. ECF No. 68 at 6, 11. Plaintiff contends that the rules violate RLUIPA and are not the least restrictive means available. ECF No. 73 at 4, 20.

Plaintiff also points out that there is no dispute between the parties as to what the rules forbid; rather, "the determination here is purely legal and raises a question of law and not fact." *Id.* at 4. Defendant has provided the language of the "Beard-Length Rule" at issue which states:

> (4) For security and identification purposes, no inmate shall be permitted to have his or her hair, to include eyebrows and facial hair, dyed, cut, shaved or styled according to fads or extremes that would call attention to the inmate or separate inmates into groups based upon style. . . . All inmates shall elect either to be clean shaven or to grow and maintain a half-inch beard. Such a beard shall include all the hair that grows naturally on the face and front of the neck, excluding eyebrows and eyelashes. Inmates shall not display any other type, style, or arrangement

of hair on the face nor front of the neck. Inmates shall not sculpt nor edge their beards. No numbers, symbols, letters, nor other designs shall appear in inmate beards. Those male inmates who desire to remain clean shaven shall be clipper shaved three times per week, and those inmates who desire to grow a half-inch beard shall have their beards trimmed three times per week with a clipper fitted with a half-inch guard.

FLA. ADMIN. CODE R.§ 33-602.101(4) (quoted in ECF No. 68 at 3).

Defendant advises that the "'Strip-Search Rule' at issue deals with the entirety of the Florida Administrative Code outlining the search policy of the Florida Department of Corrections." ECF No. 68 at 4 (citing FLA. ADMIN. CODE R. § 33-602.204).

**Allegations of the complaint**

Plaintiff is of the Muslim faith, and claims that Defendant's rule concerning permissible beard length violates his rights under the RLUIPA. ECF No. 1 at 7. He also challenges Defendant's "strip search policy" under the RLUIPA because it does not allow him "to keep his awrah (area between navel and knees) covered" after being searched. *Id.* at 15, 17. As relief, Plaintiff seeks changes to Defendant's rule which will allow him "to grow a fist length beard, trim the moustache," and to "cover his awrah after being stripped out." ECF No. 1 at 8, 15.

**Legal standards governing a motion for summary judgment**

Case No. 4:16cv49-WS/CAS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Put simply, motions "for summary judgment [are] proper where the issues to be resolved are questions of law, not fact."  United Nat. Ins. Co. v. Horning, Ltd., 882 F. Supp. 310, 312 (W.D.N.Y. 1995).  Summary judgment is also proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The parties have been provided a discovery period.  ECF No. 34.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2553.  The non-moving

party must then show[2] the court "that there is an absence of evidence to

support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. An

issue of fact is "material" if it could affect the outcome of the case. Hickson

Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004)

(citations omitted). The court must decide "whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." Hickson Corp.,

357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252,

106 S.Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All reasonable inferences

must be resolved in the light most favorable to the nonmoving party,

Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), "only if

there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S.

372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v.

DeStefano, 557 U.S. 557, 586, 129 S.Ct. 2658, 2677, 174 L. Ed. 2d 490

(2009)).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S.Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). A nonmoving party need not produce evidence in a form that would be admissible at trial. Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.

"Cross motions for summary judgment do not change the standard."

Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)) (quoted in Ernie Haire Ford, Inc., 541 F. Supp. 2d at 1297-98)).  Because Plaintiff (as the party with the burden of proof) has a heavier burden on summary judgment, the Court will consider the Defendant's motion first.  If Defendant's motion is denied, the Court will consider whether Plaintiff is entitled to judgment as a matter of law.

**Rule 56 Evidence**[3]

Plaintiff is "a Muslim" prisoner in the custody of the Florida

Department of Corrections; he is currently housed at Martin Correctional

Institution.  ECF No. 42, Ex. A [Plaintiff's Aff.] (ECF No. 42 at 17); ECF No.

47, Ex. A (ECF No. 47-1); *see also* ECF No. 73 at 22.  Plaintiff is serving a

life sentence.  ECF No. 47-1 at 2.  As a prisoner, Plaintiff is subject to

punishment if he does not comply with the rules of the Department,

including the "grooming policy."  ECF No. 42 at 3, 7.

Plaintiff's first affidavit declares his belief that "it is mandatory for an

adult male-Muslim to grow the beard at least a fist length and trim the

moustache."  ECF No. 42 at 18.  He also believes "it is mandatory for an

adult male-Muslim to keep his awrah covered (the area between the navel

---

[3] Plaintiff's summary judgment motion is sworn under penalty of perjury.  ECF No. 42 at 15.  To the degree Plaintiff's motion includes a statement of facts which are based on Plaintiff's personal knowledge, they have been considered.  Defendant submitted two exhibits with her renewed summary judgment motion.  ECF No. 68.  The first exhibit (Ex. A) is 96 pages in length and consists of the declaration of Carl Wesley Kirkland, Jr., and several attachments.  The second exhibit (Ex. B) consists of 27 pages and is a copy of a Report and Recommendation entered in case number 4:04cv105-WTH-GRJ, by United States Magistrate Judge Gary R. Jones on February 16, 2018.  Similar to this case, Defendant did not submit sufficient evidence with its initial summary judgment motion, but after entry of a report and recommendation, Defendant filed a renewed motion for summary judgment.  *See* Ex. B at 5-6, 20.  What is not similar to this case is that the issues in case number 4:04cv105 do not concern the Department's rules regarding beard length or strip search policies.

and knees) in the presence of other people." *Id.* Plaintiff submitted the

affidavits of two other Muslim inmates who share the same three beliefs:

(1) growing a beard is mandatory; (2) keeping the awrah covered is

mandatory; and (3) "trimming the moustache is mandatory." *Id.* at 20-23

[Ex. A].

Plaintiff's second affidavit, submitted with his response to

Defendant's renewed summary judgment motion, states that when a

shakedown occurs, "officers storm in the" dormitories unannounced and

either order all inmates into their cells or require them to not move, and

stay right where they are. ECF No. 73 at 35-36. Inmates who were told to

stay put are then ordered to go to the showers where "the strip search

process is carried out." *Id.* at 36. It appears that while the inmates are

gone, the "entire dayroom area," including walkways, are searched. *Id.*

As for the inmates ordered into their cells, officers proceed to each

individual cell where the strip search process is carried out. *Id.* This

process involves having the inmate take his shirt off, turn it inside out, and

hand it to the officer. *Id.* "Each article of clothing worn is searched in [that]

manner until the inmate is completely naked." *Id.*

Plaintiff states that on some occasions, an inmate is ordered "to take off all his clothing and place it "in a pile, then each article of clothing is inspected piece by piece."  ECF No. 73 at 37.  He declares that after "every 'spot' of the body is examined," inmates are told to put on their boxer shorts and shower slides and go wait in the dayroom.  *Id.*  However, he says that at other times, inmates are "ordered to put on pants or shorts, t-shirts, and" slides and go to the dayroom.  *Id.*  The search process always keeps "previously searched inmates separated from those who have not been searched."  *Id.*

Plaintiff presented evidence that in the State of New Jersey, both pat searches and strip searches are conducted.  ECF No. 73 at 26.  Inmates are "permitted to have the hair style or length of hair they choose, including beards and mustaches, provided their hair is kept clean and does not present a safety hazard, or a health, sanitary or security problem."  *Id.* at 27.  The rules state that when the length is found to present a safety hazard, the inmate shall be required to "trim or cut his or her hair or wear an appropriate protective head and/or beard covering."  *Id.* at 27.  Plaintiff also submitted grooming standards for the State of New York which reveals that inmates "may grow a beard and/or mustache, but beard/mustache hair

may not exceed one (1) inch in length" absent a court order or the granting

of an exemption based on religion.  *Id.* at 31.  Additionally, if an inmate

"drastically changes his or her appearance by changing the length, style,

and/or color of his or her hair, or growing or shaving a beard and/or

mustache, he or she will be re-photographed for identification purposes."

*Id.* at 33.  "All such re-photographs will be at the expense of the inmate."

*Id.*  Finally, Plaintiff points out that during a strip search, inmates are

already directed to "rub their fingers through their mouths, wipe over their

heads, around his ears, and rub through his beard" to "determine if

contraband is present.  ECF No. 42 at 26.

Defendant has presented evidence which explains that the

challenged grooming policy "helps to eliminate a potential for concealing

contraband."  ECF No. 68, Ex. A at ¶ 7.  Defendant presented the affidavit

of Carl Wesley Kirkland, Jr., the Deputy Director of Institution Operations

for the Florida Department of Corrections.  ECF No. 68, Ex. A (ECF No. 68-

1).  Mr. Kirkland states that in February 2015, the Department's policy

permits "inmates to grow a full beard of no more than ½ inch in length."  *Id.*

at ¶ 4.  "No other type of facial hair is authorized, including any type of

stylized or sculpted facial hair, such as a soul patch, goatee, fu man-chu, or

any type of writing or design sculpted into the hair." *Id.* "This change eliminated the need for medical shaving passes, which were previously issued for inmates with a skin condition called pseudofolliculitis barbae." *Id.*

Mr. Kirkland's affidavit explains that "uniform hair length and closely trimmed facial hair helps to eliminate a potential for concealing contraband." *Id.* at ¶ 7. "[B]ushy beards provide a place for concealing weapons, drugs, or smaller escape paraphernalia, such as homemade handcuff keys." *Id.* The affidavit states that "[d]angerous yet small items can be hidden in relatively short beards, such as bits of razorblades and handcuff keys or pieces of items used to make them." *Id.* Additionally, "[i]nsulin needles, used in the prison for medical reasons, are very small and can be hidden in shorter beards and used by inmates to take drugs or create weapons like blow guns and darts." ECF No. 68, Ex. A at ¶ 7.[4]

---

[4] Notably, however, those examples were provided from the "troubled prison system" of Virginia which Mr. Kirkland said "had a grooming policy they were not enforcing . . . ." ECF No. 68-1 at 4. Several other inmate escapes highlighted concerned prisoners who had hidden handcuff keys in their hair. *Id.* at 5. Another example was provided of an inmate who had "two makeshift keys hidden in his beard." The keys were discovered because an officer determined that his "hair had grown too long." *Id.* Those differences are notable and distinguish this case. Not enforcing rules by permitting hair or beards that are too long is not the equivalent of allowing a 3-inch beard.

Additionally, the affidavit advises that the rule prevents the use of hairstyles such as fad or sculpted cuts "as a mechanism for gang or associational identification." *Id.* at ¶ 6. "Gang activity in the prison setting presents serious security and safety problems, including potential for riots, personal injury to staff and inmates, and damage to property." *Id.* "Uniform regulations in clothing, grooming, personal property, and hygiene requirements are an integral and essential part of maintaining the degree of internal regimentation and control necessary to ensure safety and security in our prisons and to guarantee they are operated effectively and efficiently." *Id.* at ¶ 15.

Moreover, the rule is "paramount in both preventing escapes and recapturing escapees." *Id.* at ¶ 8. The affidavit points out that altering hair and beard length and style can significantly change an individual's appearance. *Id.*[5] Further, growing a long beard can mask significant identifying marks, such as scars, tattoos or birthmarks. *Id.* Permitting only a minimal beard enhances the probability of recapturing an escapee in a short period of time. *Id.* at ¶ 11. That is also true because allowing an

---

[5] Attachment 3, submitted with the affidavit, shows how changes to hairstyle, length, and beard length can alter one's appearance. ECF No. 68-1 at 64-76.

inmate to grow a 3-inch beard would permit an inmate "to frequently and quickly change [his appearance] by shaving part or all of it . . ."  *Id.* at ¶ 11.

As an additional reason, the affidavit explains that the beard length rule makes it easier for staff to quickly and accurately identify inmates within the Florida prison system.  Ex. A at ¶ 9.  As a security matter, "correctional officers conduct count procedures numerous times" each day; they "must quickly identify and account for the presence of every inmate."  *Id.* at ¶ 10.  Officers identify each inmate by comparing the inmate to his photograph on his Department of Corrections' identification card ("ID").  *Id.*  "Several weeks of hair and beard growth can cause one's appearance to change enough that it hinders identification procedures and may require a new picture ID."  *Id.*  The ability to positively, and efficiently, identify inmates during "count" is critical to institutional security and verification of inmate location.  *Id.*  Additionally, moving inmates from one place to another within an institution requires efficient identification of inmates at various check points.  *Id.*  The security of the institution requires easy identification, and this process must be done under the constraints of limited security staffing.  *Id.*  The average inmate to staff ratio in the Department's institutions is approximately 5 to 1.  *Id.*  However, some

areas have much larger ratios, in the range of 40 or 50 inmates to 1 correctional officer.  *Id.* at ¶ 10.  In light of that disparity, quick recognition of inmates is essential.  *Id.*

As for the search rule, Defendant's affidavit explained that whenever "an inmate leaves his cell, the inmate is in almost every instance subjected to a full body and cell search, particularly when it comes to Close Management ('CM') inmates."  ECF No. 68, Ex. A at ¶ 17.  "Periodic cell and body searches are also conducted at random."  *Id.*  This rule "is intended to protect the individuals within the prison system, including, but not limited to officers, volunteers, visitors, and the prisoners themselves." *Id.*  The rule "accomplishes this goal by limiting the introduction and spread of contraband within the prison system."  *Id.*

The same security issues exist in the context of a prisoner's body and clothing as exist concerning contraband and beard length.  *Id.* at ¶  18. Prisoners sometimes store contraband in their "clothing and within their oral, anal, and other cavities to avoid detection by department staff."  *Id.* Thus, in an effort "to stymie the amount of contraband within the prison system," inmates are subject to searches on both a periodic and random basis.  *Id.* at ¶ 19.

During these searches, inmates are often subject to fully-body

searches, referred to as "strip searches."  *Id.* at ¶ 20.  While conducting

these searches, "inmates are often required to sit in their boxers and

shower-shoes while waiting for searches of other inmates to be concluded."

*Id.*  "Prisoners are sometimes striped searched in groups depending on the

number of inmates and available staff."  *Id.* at ¶ 20.  When conducting a

mass search of a dormitory, "it is common for inmates to be escorted from

the bedding area to the designated search area in their boxers."  *Id.*  This

minimizes the ability for an inmate to hide contraband in his pants or shirt

while being escorted to the search area.  *Id.*  After being searched, the

inmate's boxer shorts are returned to him and the group is "escorted to a

designated area until the dorm search is completed."  *Id.*

"The reason why inmates are required to sit in minimal amounts of

clothing until all searches are conducted is due to the need to control

contraband."  *Id.* at ¶ 21.  Inmates always outnumber officers, generally on

the basis of 5 to 1, but the numbers are often much greater, sometimes as

much as 40 or 50 inmates to 1 security officer.  *Id.*  Mr. Kirkland's affidavit

declares that the "only way to control the spread of contraband in a

situation with such a large discrepancy is to require all inmates being

searched to sit in a minimal amount of clothing, and once all the searches are conducted, to allow the inmates all to get dressed at the same time." *Id.* at ¶ 21.  "Any other method would allow for the spread of contraband as inmates would pass contraband from an unsearched individual to an individual whom had already been searched and was dressed."  *Id.* at ¶ 22. A process that allows for the passing of contraband defeats the purpose of the search.  *Id.* If contraband could be passed in such a way, it would require a second search of a prisoner, resulting in the duplication of efforts and a "never-ending number of searches as opposed to a single search." *Id.*  Officers would be tied up with conducting searches, and would not be able to perform the other requirements of their jobs.  *Id.*  "Though officers do their best to control contraband, it is not possible for an officer to pay attention to every prisoner while conducting searches."  *Id.*  The manner in which the Department conducts these searches means that prisoners will not be fully clothed in front of others, but the amount of time this occurs is minimal and is necessary to control the flow of contraband.  *Id.* at ¶ 23.

Finally, Mr. Kirkland's affidavit states that "allowing Muslim inmates an exception" to the ½-inch beard rule "would amount to preferential treatment."  *Id.* at ¶ 12.  "Preferential treatment causes discord in the

inmate population and creates a hostile environment for staff and other inmates." *Id.* "If an inmate is perceived by other inmates as receiving preferential treatment, it can prove problematic not only for the inmate who receives the exemption but, more importantly, could lead to disruption in the institution when other inmates request special consideration and are denied." *Id.* "Inmates expect to be treated the same, and the legitimacy of the reason why some may be treated differently makes no difference to them." *Id.* "Consistency of expectations and enforcement is absolutely essential to maintaining order in a prison environment." *Id.*

## Analysis

At the time of the events in question, the beard length rule required that all inmates "be clean shaven," unless an "exemption" was granted on the "basis of a medical diagnosis" which would permit inmates to "keep their facial hair closely trimmed with scissors of clippers." FLA. ADMIN. CODE R. 33-602.101(4); Plaintiff's Ex. D (ECF No. 1 at 30). That version of the rule, however, is no longer in effect. The current version of the rule was amended following the Supreme Court's decision in Holt v. Hobbs, 135 S.Ct. 853, 859, 190 L. Ed. 2d 747 (2015) (holding that corrections' beard policy violated the "Religious Land Use and Institutionalized Persons Act of

2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc et seq., which prohibits

a state or local government from taking any action that substantially

burdens the religious exercise of an institutionalized person unless the

government demonstrates that the action constitutes the least restrictive

means of furthering a compelling governmental interest.").  ECF No. 47 at

23.  The current rule provides:

> All inmates shall elect either to be clean shaven or to grow and
> maintain a half-inch beard.  Such a beard shall include all the
> hair that grows naturally on the face and front of the neck,
> excluding eyebrows and eyelashes.  Inmates shall not display
> any other type, style, or arrangement of hair on the face nor
> front of the neck.  Inmates shall not sculpt nor edge their
> beards.

FLA. ADMIN. CODE R.§ 33-602.101(4) (quoted in ECF No. 68 at 3).

Plaintiff requests permission to grow a "fist full" beard which he

explains is approximately "3 inches or a little more."  ECF No. 1 at 33.  He

asserts that the ½-inch beard rule violates his religious beliefs.  Defendant

asserts that the beard length rule "meets the constitutionally-required

minimum, and the rule is the least restrictive means of furthering a clear

compelling governmental interest."  ECF No. 68 at 4.  Defendant further

contends that it does not violate RLUIPA and is "consistent with the state of

the law as established by Holt . . . ."  *Id.* at 6.

**RLUIPA**

In 1993, Congress enacted the Religious Freedom Restoration Act

(RFRA) to "provide greater protection for religious exercise than is

available under the First Amendment." Holt v. Hobbs, 135 S.Ct. 853, 859-

60, 190 L. Ed. 2d 747 (2015) (citing Burwell v. Hobby Lobby Stores, Inc.,

573 U.S. ——, 134 S.Ct. 2751, 2760-61, 189 L.Ed.2d 675 (2014)).

However, Congress relied on Section 5 of the Fourteenth Amendment in

enacting RFRA,[6] "but in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct.

2157, 138 L.Ed.2d 624 (1997), [the Supreme] Court held that RFRA

exceeded Congress' powers under that provision." Holt, 135 S.Ct. at 860

(citing City of Boerne, Id., at 532–536, 117 S.Ct. 2157).

> Congress responded to City of Boerne by enacting RLUIPA,
> which applies to the States and their subdivisions and invokes
> congressional authority under the Spending and Commerce
> Clauses. See § 2000cc–1(b). RLUIPA concerns two areas of
> government activity: Section 2 governs land-use regulation,
> § 2000cc; and Section 3 - the provision at issue in this case -
> governs religious exercise by institutionalized persons,
> § 2000cc–1. Section 3 mirrors RFRA and provides that "[n]o

---

[6] "RFRA provides that '[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability,' unless the government 'demonstrates that application of the burden to the person - (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" 42 U.S.C. §§ 2000bb-1(a), (b) (quoted in Holt, 135 S. Ct. at 860).

> government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution ...
> even if the burden results from a rule of general applicability,
> unless the government demonstrates that imposition of the
> burden on that person—(1) is in furtherance of a compelling
> governmental interest; and (2) is the least restrictive means of
> furthering that compelling governmental interest."
> § 2000cc–1(a). RLUIPA thus allows prisoners "to seek religious
> accommodations pursuant to the same standard as set forth in
> RFRA." Gonzales v. O Centro Espírita Beneficente Uniõ do
> Vegetal, 546 U.S. 418, 436, 126 S.Ct. 1211, 163 L.Ed.2d 1017
> (2006).

Holt, 135 S.Ct. at 860.

> Several provisions of RLUIPA underscore its expansive
> protection for religious liberty. Congress defined "religious
> exercise" capaciously to include "any exercise of religion,
> whether or not compelled by, or central to, a system of religious
> belief."  § 2000cc–5(7)(A). Congress mandated that this
> concept "shall be construed in favor of a broad protection of
> religious exercise, to the maximum extent permitted by the
> terms of this chapter and the Constitution."  § 2000cc–3(g).
> And Congress stated that RLUIPA "may require a government
> to incur expenses in its own operations to avoid imposing a
> substantial burden on religious exercise." § 2000cc–3(c).

135 S.Ct. at 860 (citing Hobby Lobby, 134 S.Ct. at 2761–62, 2781–82).

"RLUIPA thus protects institutionalized persons who are unable freely to

attend to their religious needs and are therefore dependent on the

government's permission and accommodation for exercise of their religion."

Cutter v. Wilkinson, 544 U.S. 709, 721, 125 S.Ct. 2113, 2122, 161 L. Ed. 2d 1020 (2005).

Unde the RLUIPA, Plaintiff bears "the initial burden of proving that" a challenged policy "implicates his religious exercise."  Holt, 135 S.Ct. at 862. The relevant religious exercise must be grounded in "a sincerely held religious belief" as opposed to some other motivation, and Plaintiff must also prove that the challenged policy "substantially burdened that exercise of religion."  135 S.Ct. at 862.

Here, as in Holt, Plaintiff "has easily satisfied that obligation."  *Id.*  He has shown that the grooming policy substantially burdens his religious beliefs, and it is undisputed that his beliefs are sincerely held.[7]  *See* Holt, 135 S.Ct. at 862 (citing Hobby Lobby, 134 S.Ct. at 2774, n.28).  Plaintiff has shown that he would be punished if he did not comply with Defendant's

---

[7] "RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise."  Holt, 135 S.Ct. at 862.  The Court accepted that if a prisoner is forced to choose between following his religious beliefs and facing "serious disciplinary action," then he is substantially burdened in his religious exercise.  135 S.Ct. at 862.  Additionally, RLUIPA "applies to an exercise of religion regardless of whether it is 'compelled'" and regardless of whether the belief is "shared by all of the members of a religious sect."  *Id.* at 862-63 (citing § 2000cc-5(7)(A)).  Thus, Defendant's assertion that Plaintiff has not been substantially burdened because he is permitted to grow a ½-inch beard, *see* ECF No. 68 at 7, is rejected because Defendant does not deny that Plaintiff is required to choose between growing his beard to a 3-inch length or face discipline.

grooming policy and Defendant has not argued otherwise.  Thus, because

the policy forces Plaintiff to make a choice between compliance with the

Department's rules or his religious belief, he has "met his burden of

showing" that the challenged "grooming policy substantially burdened his

exercise of religion . . . ."  Holt, 135 S.Ct. at 863; *see also* Smith v. Owens,

848 F.3d 975, 981 (11th Cir. 2017) (noting that "Holt requires the district

court to consider the choice that the grooming policy imposes on Smith:

either to engage in conduct that violates his sincerely held religious beliefs,

or to face disciplinary action.").

Thereafter, the burden shifts to Defendant to "prove that the

challenged regulation is the least restrictive means of furthering a

compelling governmental interest."  Knight v. Thompson, 797 F.3d 934,

943 (11th Cir. 2015); Holt, 135 S.Ct. at 863 (quoting § 2000cc–1(a)).  "[I]f a

less restrictive means is available for the Government to achieve its goals,

the Government must use it."  United States v. Playboy Entm't Grp., Inc.,

529 U.S. 803, 815, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (quoted in

Holt, 135 S.Ct. at 864).[8]  RLUIP does not, however, "give courts carte

---

[8] As an initial matter, judicial notice is taken that the Florida Department of Corrections receives federal funds and is subject to RLUIPA.  United States v. Sec'y, Florida Dep't of Corr., No. 12-22958-CIV, 2013 WL 6697786, at *1 (S.D. Fla. Dec. 6,

blanche to second guess the reasoned judgments of prison officials."

Knight, 797 F.3d at 943.  "The Supreme Court has cautioned that '[w]e do

not read RLUIPA to elevate accommodation of religious observances over

an institution's need to maintain order and safety,' and 'an accommodation

must be measured so that it does not override other significant interests.'"

Knight, 797 F.3d at 943 (quoting Cutter, 544 U.S. at 722, 125 S.Ct. at

2122).  "[P]rison security is a compelling state interest, and . . . deference is

due to institutional officials' expertise in this area."  Cutter, 544 U.S. at 729,

n.13, 125 S.Ct. at 2127, n.13; *see also* Ali v. Stephens, 822 F.3d 776, 786

(5th Cir. 2016) (finding that grooming policy which banned a fist length

beard was based on the "compelling interest in staunching the flow of

contraband into and within its facilities.").

Defendant asserts that its current rule is consistent with the Court's

decision in Holt and does not violate the RLUIPA.  ECF No. 68 at 6.  It is

argued that Florida's grooming policy "is consistent with the minimum

requirement established by the Court."  *Id.*

---

2013) vacating the preliminary injunction and dismissing the appeal as moot, 778 F.3d
1223 (11th Cir. 2015).

The problem with that argument is that <u>Holt</u> did not portend to establish a "minimum requirement" for correctional agencies which would be acceptable under the RLUIPA.  Rather, the <u>Holt</u> decision examined a specific, challenged policy of the Arkansas Department of Correction and concluded that it violated the RLUIPA because the Department did not show that its policy was "the least restrictive means of furthering its compelling interest."  135 S.Ct. at 859.[9]  That is, indeed, the difficulty for Defendant here.

Defendant has demonstrated that the beard length rule furthers several important and compelling interests.  ECF No. 68.  First, it is argued that the rule furthers the compelling governmental interest of prison security and the control of contraband.  *Id.* at 7.  Second, a uniform length and style rule eliminates gang activity.  Third, the rule helps prevent escapes and assists in recapturing an escapee by reducing the way an inmate can quickly alter his appearance.  Fourth, the rule assists staff in quickly and accurately identifying inmates.  ECF No. 68 at 7-10.

---

[9] The Court also had doubt as to "whether the prohibition against petitioner's beard furthers its compelling interest about contraband."  <u>Holt</u>, 135 S.Ct. at 859.

Prison security is paramount, and an inmate's ability to conceal items that could be used either as a weapon or means of escape is of great concern.  *See* Holt, 135 S. Ct. at 859 (stating that the Court did "not question the importance of the Department's interests in stopping the flow of contraband and facilitating prisoner identification"); Cutter v. Wilkinson, 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (prison security is compelling state interest) (cited in Tanksley v. Litscher, 723 F. App'x 370, 372 (7th Cir. 2018); Linehan v. Crosby, 346 F. App'x 471, 473 (11th Cir. 2009) (finding that the "DOC has a compelling governmental interest in keeping costs down and preventing security risks.").  Defendant points out that "long hair and bushy beards provide" a means to conceal "weapons, drugs, or small escape paraphernalia, such as homemade handcuff keys."  ECF No. 68 at 7.  While there is no doubt that such conditions elevate security concerns, the issue is whether those concerns can be adequately alleviated in a manner that is less restrictive than denying the request for a 3-inch or "fist length" beard.

Plaintiff says they can.  Plaintiff points out that an inmate is already required to rub through his beard to determine if contraband is present. ECF No. 73 at 5.  Moreover, no reason has been offered by the

Department to explain why a ½-inch beard could be adequately searched, but a 3-inch beard could not.  In <u>Holt</u>, the Supreme Court noted that "the Department has failed to prove that it could not adopt the less restrictive alternative of having the prisoner run a comb through his beard."  <u>Holt</u>, 135 S.Ct. at 864.  Furthermore, the Fifth Circuit Court of Appeals came to the same conclusion in <u>Ali v. Stephens</u>, 822 F.3d 776, 789 (5th Cir. 2016). That court found that "fist-length beards" could be "searched in the same way as head hair," that is, by having "inmates 'run their fingers through that beard.'"  <u>Ali</u>, 822 F.3d at 788 (noting that these "self-searches would 'take a little more time' than visual inspections.").

Plaintiff has pointed out that several other states (New York and New Jersey) permit longer beards and address the same security concerns by having the inmate run his hands through his beard.  ECF No. 73 at 5 (citing ECF No. 73 at 33).  Defendant argues that Plaintiff's reliance on what other jurisdictions permit should not be "controlling" and Defendant should not be "required to make the same decision."  ECF No. 68 at 11.  While that is true, the fact that other prison systems permit longer beards is both relevant and revealing.  For example, in <u>Procunier v. Martinez</u>, 416 U.S. 396, 414, n.14, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Court noted that

"[w]hile not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction." <u>Holt</u>, 135 S.Ct. at 866 (quoting <u>Procunier</u>).  It is also revealing because the fact that "other prisons allow inmates to grow beards while ensuring prison safety and security suggests that the Department could satisfy its security concerns through a means less restrictive than denying" Plaintiff the ability to grow a fist length or 3-inch beard.  <u>Holt</u>, 135 S.Ct. at 866.[10]

It is true that a longer beard could conceal greater items of contraband.  Instead of worrying that a razor blade, SIM card, or homemade handcuff key may be hidden in a ½-inch beard, a larger item such as a needle could be concealed in a longer beard.  *See* 135 S.Ct. at 863.  Yet those items may also be hidden in long hair, which is permissible

---

[10] The Texas Department of Criminal Justice now permits inmates to grow a "'fist-length' (i.e., four-inch) beard" in the wake of <u>Ali v. Stephens</u>, 822 F.3d 776, 780 (5th Cir. 2016) (holding that the grooming policy which banned four-inch beards violated the RLUIPA).  *See* <u>Strong v. Livingston</u>, No. 2:16-CV-131, 2018 WL 1115656, at *2 (S.D. Tex. Feb. 1, 2018), report and recommendation adopted, No. 2:16-CV-131, 2018 WL 1071453 (S.D. Tex. Feb. 27, 2018)(noting that the "new grooming policy, which became effective on February 1, 2017, allow[s] prisoners to wear a four-inch beard pursuant to a religious exemption.").  Additionally, a case is pending which challenges the Arizona Department of Corrections' ban on growing a fist length beard under RLUIPA.  <u>Nance v. Miser</u>, 700 F. App'x 629, 633 (9th Cir. 2017) (remanding case "for further proceedings regarding Defendants' restriction on the length of Nance's beard.").

for female inmates.  Additionally, such items may be hidden in clothing or footwear.  Prohibiting a 3-inch beard does not eliminate that concern. Searches will still be required.  Thus, limiting a beard to only a ½-inch has not been shown to be the least restrictive means of preventing contraband. *See* Ali, 822 F.3d at 787-89 (holding that "a visual inspection accompanied by having the inmate shake his own beard, if needed, effectively reveals contraband" and that the "ban on four-inch beards did not satisfy the compelling-interest test.").

In addition, concerns over increasing the manner in which an inmate may alter his appearance by allowing a longer beard may be diminished through the use of the dual photograph policy discussed in Holt, 135 S.Ct. at 865.  *See also* Ali, 822 F.3d at 791 (while incorporating a policy to issue a new ID card to an inmate permitted to grow a beard, the Fifth Circuit concluded that "TDCJ has not explained why it cannot use the same technique for a beard that is four inches.").  Dual photographs would also enhance the process of recapturing escapees and of preventing escapes.[11]

---

[11] This conclusion is contrary to the belief asserted in the Kirkland affidavit that "[r]equiring law enforcement to scan multiple pictures when searching for the escapee, reduces the likelihood of recognizing and recapturing him."  ECF No. 68-1 at 6.  At any rate, that assertion is a belief as it has not been shown to be a fact based on personal knowledge.  More importantly, the Supreme Court noted the Arkansas Department of

Furthermore, Defendant's argument that the efficient movement of inmates and conducting count is a compelling interest supporting the ban on beards longer than ½-inch is also rejected. Having a longer beard which is photographed on an inmate ID card takes no longer for a correctional officer to verify than looking at an ID card picturing an inmate with a shorter beard. If an inmate alters his appearance by shaving his beard or shaving his head, a new card would be made. *See* ECF No. 68-1 at 6 (noting that security staff "update photographs, databases, and ID cards" when an inmate's appearance changes). Furthermore, as noted in greater detail below, the grooming rule already provides inmates with a choice that can significantly alter his appearance. An inmate may choose to shave his head under the current rule. Such an alteration is permissible, although it is assumed that a new ID card would be made.[12]

_____

Corrections' admission that "the dual-photo method . . . might help authorities apprehend a bearded prisoner who escapes and then shaves his beard once outside the prison." Holt, 135 S.Ct. at 865.

[12] To the degree Defendant contends that inmates could "quickly change their identity by shaving part or all of" a 3-inch beard, that argument is not well taken. *See* ECF No. 68-1 at 6. An inmate may just as easily grow medium length hair, short hair, or shave his head. Such changes could occur quickly, but are permissible under the current policy. Furthermore, the argument that the "dual photo method . . . would not work" is rejected in light of Holt, 135 S.Ct. at 865 (noting that the issue of an inmate's confusing the guards by shaving his beard could largely be solved "by requiring that all inmates be photographed without beards when first admitted to the facility and, if

Furthermore, dual photograph ID cards could minimize the need to update cards should an inmate choose, for example, to shave his head in the summer and grow longer hair in the winter.  A dual card could also be used to accommodate the needs of an Muslim inmate who enters D.O.C. custody clean shaven, but who grows a beard in accordance with his religious beliefs.  Whether an officer looks at one ID card with two pictures, or one ID card with a single picture, the difference in the amount of time it takes to verify an inmate is minuscule, surely amounting to no more than five seconds.  The ability to conduct count or move inmates efficiently has not been shown to be hindered by permitting an inmate to grow a three-inch beard which will, necessarily, be memorialized on his prison ID card. *See* Watkins v. Jones, No. 4:12cv215-RH/CAS, 2015 WL 5468647, at \*10 (N.D. Fla. Aug. 28, 2015), report and recommendation adopted in part, No. 4:12cv215- RH/CAS, 2015 WL 5468648 (N.D. Fla. Sept. 15, 2015), *aff'd sub nom.* Watkins v. Fla. Dep't of Corr., 669 F. App'x 982 (11th Cir. 2016) (finding that "argument that allowing a beard for religious reasons could prevent 'efficient and secure inmate movement within [a] prison' [was] not compelling.").

---

necessary, periodically thereafter.").

Case No. 4:16cv49-WS/CAS

It is a subjective determination as to whether a 3-inch beard significantly alters one's appearance from having a ½-inch beard.  *See* ECF No. 68-1 at 64-75.  Certainly there is a difference in appearance, but that appears to the undersigned to be minimal.  However, a far greater difference in appearance is achieved by shaving one's head.  As it now stands, inmates can alter their appearance by choosing to shave their heads.  The current grooming rule permits an inmate to "have their hair cut short to medium uniform length" or to "shave their entire heads with clippers in a uniform manner."  FLA. ADMIN. CODE R. 33-602.101(4) (effective 7-20-2017).[13]  Either choice is permitted, so long as the inmate is not "using his hairstyle or lack thereof to demonstrate gang affiliation or otherwise pose a threat to institutional security."  *Id.*

While gang activity in prison is certainly a concern, and one raised by Defendant in this case, *see* ECF No. 68 at 8, growing a 3-inch beard has not been shown to be particularly troubling because inmates are permitted to shave their heads which, as Plaintiff points out, could be associated with "white supremacist" sects.  *See* ECF No. 73 at 7.  The rules prohibit any

---

[13] This same rule also provides the choice of either being "clean shaven or to grow and maintain a half-inch beard."  FLA. ADMIN. CODE R. 33-602.101(4).

hairstyle which demonstrates a gang affiliation.  FLA. ADMIN. CODE R. 33-602.101(4).  Thus, if growth of a 3-inch beard becomes a gang affiliation, it may be dealt with under the current Departmental rules.  Plaintiff contends that "Defendant already tolerates this security risk" by permitting inmates to shave their head and "perpetrate associational identification with Defendant's current policy."  ECF No. 73 at 8.  He contends that this demonstrates an "underinclusiveness" which does not advance a compelling interest.  *Id.*

The Supreme Court has found that "underinclusiveness" is relevant to the issue of a compelling interest.  Williams-Yulee v. Fla. Bar, 135 S.Ct. 1656, 1668, 191 L. Ed. 2d 570 (2015) (stating "[u]nderinclusiveness can also reveal that a law does not actually advance a compelling interest.").  The Court has recognized "that underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'"  Williams-Yulee, 135 S.Ct. at 1668 (quoting Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 802, 131 S. Ct. 2729, 2740, 180 L. Ed. 2d 708 (2011)).  Although Williams-Yulee was a First Amendment case, courts have found that if a policy or law is underinclusive, it also implicates FLUIPA analysis by raising "the

inference that the government's claimed interest isn't actually so compelling after all." Ali, 822 F.3d at 785 (quoting Yellowbear v. Lampert, 741 F.3d 48, 60 (10th Cir. 2014) (stating "[a]s the Supreme Court has said, it's sometimes hard to see how a law or regulation can 'be regarded as protecting an interest of the highest order,' as serving a compelling interest, 'when it leaves appreciable damage to [the] supposedly vital interest unprohibited.'") (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993))); *see also* Ware v. Louisiana Dep't of Corr., 866 F.3d 263, 269 (5th Cir. 2017), cert. denied, 138 S. Ct. 1181 (2018). Plaintiff makes a valid argument that Defendant implicitly tolerates gang or associational identity already by permitting inmates to shave their heads. ECF No. 73 at 8. Of course, it is true that all persons who desire to shave their heads are not white supremacists. By the same token, not all persons who wish to grow a fist length beard are Muslim adherents. However, Plaintiff's argument that the grooming rule is underinclusive was not rebutted by Defendant.

> If a policy is underinclusive, the prison must provide "an adequate explanation for its differential treatment" in order to avoid the conclusion that the policy does not serve a compelling interest. *Ali*, 822 F.3d at 787. A prison can rebut a claim of underinclusiveness "by showing that it hasn't acted in a

> logically inconsistent way-by (say) identifying a qualitative or
> quantitative difference between the particular religious
> exemption requested and other ... exceptions already
> tolerated."  *Id.* (omission in original) (quoting *Yellowbear*, 741
> F.3d at 61).

Ware, 866 F.3d at 269 (concluding that the grooming policies which denied

inmate who is adherent of the Rastafari religion and would not willingly cut

his dreadlocks were "underinclusive because the parties agree that they do

not apply to approximately half of DOC inmates: those inmates housed in

parish jails for the duration of their incarceration but who remain in the legal

custody of DOC (parish inmates)."  Because no explanation has been

provided as to this issue, it is concluded that the interest in limiting gang

activity is not a compelling interest supported by denying Plaintiff's request

to grow a 3-inch beard.  The grooming rule is, on its face, underinclusive

because inmates are permitted to shave their heads.

Notwithstanding, Defendant has provided sufficient evidence to show

that the policy is supported by the compelling interest in prison security.

Accordingly, Defendant's burden is to "show that its policy is the least

restrictive means of furthering its compelling interests."  135 S.Ct. at 859.

"'The least-restrictive-means standard is exceptionally demanding,' and it

requires the government to 'sho[w] that it lacks other means of achieving its

Case No. 4:16cv49-WS/CAS

desired goal'" other than the challenged policy.  <u>Holt</u>, 135 S.Ct. at 864

(quoted in <u>Ware</u>, 866 F.3d at 269).  Defendant has not done so with

respect to the beard length rule.  Defendant has failed to show, "in the face

of [Plaintiff's] evidence, that its prison system is so different from the many

institutions that allow facial hair that the dual-photo method cannot be

employed at its institutions."  <u>Holt</u>, 135 S.Ct. at 865.  Defendant has not

established that permitting an inmate to grow 2½ more inches of beard

"poses a meaningful increase in security risk."  135 S.Ct. at 866; *see also*

<u>Ali</u>, 822 F.3d at 785, 794 (concluding that TDCJ did not meet its burden

under RLUIPA in showing that its denial of Ali's request for a fist-length was

the least restrictive means of furthering a compelling governmental

interest).

    "[I]f a less restrictive means is available for the Government to

achieve its goals, the Government must use it."  <u>Playboy Entm't Grp.</u>, 529

U.S. at 815, 120 S.Ct. 1878 (quoted in <u>Holt</u>, 135 S.Ct. at 864).  Defendant

has not met its burden to show that Plaintiff's requested extension of the

grooming policy cannot be accommodated.  <u>Holt</u>, 135 S.Ct. at 866 (stating

"the courts below deferred to these prison officials' mere say-so that they

could not accommodate petitioner's request.").  "RLUIPA, however,

demands much more." *Id.* Defendant has not shown that the refusal to permit a 3-inch beard is the least restrictive means of furthering the Secretary's interest in prison security and controlling contraband. Thus, the failure to provide a religious exemption to Plaintiff to grow a 3-inch beard violates his rights under the RLUIPA. Summary judgment should be granted in Plaintiff's favor as to this claim.

Plaintiff's second challenge to Defendant's rules is that he cannot cover his "awrah" after a strip search is conducted. ECF No. 42 at 2; ECF No. 1 at 8, 15-17. He alleged that after "strip searches and shakedowns," he must "sit in the day room" wearing only boxer shorts and shower slides. ECF No. 1 at 15; *see* also ECF No. 1 at 44. Plaintiff states that having his "awrah uncovered is an humiliation and unmodest act in the Islamic way of life." *Id.* Plaintiff seeks amendment of the policy so that he can "keep his awrah (area between navel and knees) covered immediately after being strip searched during shakedowns or any other time, after being stripped." *Id.* at 17.

Defendant has argued that prison security and the need to control contraband is a compelling interest which justifies the refusal to allow Plaintiff to put his clothes back on after a strip search under RLUIPA. ECF

No. 68 at 11, 13. Defendant has shown that contraband may sometimes be hidden within an inmate's "clothing and within their oral, anal, and other cavities to avoid detection by department staff." ECF No. 68 at 12. Furthermore, considering the inmate to correctional officer ratio, it is not possible to observe every inmate during such searches.

The possibility of one inmate passing contraband to another inmate who has already been searched seems possible. However, the risk seems to be quite low with the assumption being that inmates waiting to be searched are separated from those already searched. Indeed, Plaintiff's says as much in his response to Defendant's motion.[14] ECF No. 73 at 20 (stating that "[p]reviously searched inmates are always kept separate from those whom have not been searched."). Plaintiff contends that passing contraband will never occur because the inmates are not mingled together. ECF No. 73 at 20; *see* also ECF No. 68 at 13-14.

The ability to search for contraband and prevent inmates from passing it from one to another is a compelling interest. However, the interest appears to be nothing more than an exaggerated fear.

---

[14] His response is sworn under penalty of perjury. ECF No. 73 at 21.

> Prison officials are experts in running prisons and evaluating
> the likely effects of altering prison rules, and courts should
> respect that expertise. But that respect does not justify the
> abdication of the responsibility, conferred by Congress, to apply
> RLUIPA's rigorous standard.

Holt, 135 S.Ct. at 864.  The Court stated in Holt that "without a degree of

deference that is tantamount to unquestioning acceptance, it is hard to

swallow the argument that denying petitioner a ½-inch beard actually

furthers the Department's interest in rooting out contraband."  135 S.Ct. at

864.  Here, it is difficult to accept the argument that contraband could be

passed between inmates who have been separated.  No explanation has

been made to explain how forbidding an inmate to put on his shirt after he

has been searched while he sits with other inmates who have also already

been searched leads to a valid security concern.

Justice Sotomayor explained in her concurring opinion that "the

deference that must be 'extend[ed to] the experience and expertise of

prison administrators does not extend so far that prison officials may

declare a compelling governmental interest by fiat.'"  135 S.Ct. at 867

(quoting Yellowbear v. Lampert, 741 F.3d 48, 59 (10th Cir. 2014).  "Indeed,

prison policies 'grounded on mere speculation' are exactly the ones that

motivated Congress to enact RLUIPA."  Holt, 135 S.Ct. 867.  The policy

forbidding an inmate to put on his already searched t-shirt after he, himself, has already been searched because of a concern that some other inmate will pass him contraband amounts to speculation and "exaggerated fears" which "will not suffice to meet [RLUIPA's] requirements." Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 533 (11th Cir. 2013); *see also* Ware, 866 F.3d at 268.

Notwithstanding that conclusion, it is noted that Plaintiff's request to be permitted to put on his t-shirt and not have to "sit in his boxers and shower slides" is an enigma. Plaintiff's request is based on his argument that his religious beliefs require him to keep his "awrah" covered. Plaintiff has explained that his "awrah" is the area between the navel and the knees. It is undisputed that prisoners are required to sit in their boxer shorts after being searched. Because prisoners are not sitting around in either briefs or "speedos," the majority of a man's modest area is already covered by the boxer shorts. Boxers extend nearly to the navel, if not the navel, and part way down the leg. Accordingly, wearing a t-shirt does little to aid in covering any more of the "awrah" than is already covered by the boxer shorts.

Moreover, the RLUIPA prevents the Department of Corrections from imposing a "substantial burden" on a prisoner's religious beliefs.  Plaintiff is covered by boxer shorts and has not been forced to be seen naked or "completely exposed."  Simmons v. Williams, No. 6:14-CV-111, 2017 WL 3427988, at *14 (S.D. Ga. Aug. 9, 2017), report and recommendation adopted, No. 6:14-CV-111, 2017 WL 4162176 (S.D. Ga. Sept. 20, 2017) (noting that "at least one other court has found that a Muslim inmate's belief is not substantially burdened by the requirement that he walk to the shower wearing only boxer shorts and shower shoes.") (citing Lewis v. Ollison, 571 F. Supp. 2d 1162, 1170 (S.D. Cal. 2008)).  Plaintiff has not demonstrated that he is substantially burdened by having wear only boxer shorts until the searches are complete, and his request to wear a t-shirt does not significantly cover more of his "awrah."  Summary judgment should be granted in the Defendant's favor on this claim.

**Recommendation**

It is respectfully **RECOMMENDED** that Defendant's renewed motion for summary judgment, ECF No. 68, be **GRANTED** as to Plaintiff's "awrah" claim brought pursuant to the RLUIPA, but otherwise **DENIED**; that Plaintiff's motion for summary judgment, ECF No. 42, be **GRANTED** as to his request to grow a 3-inch beard pursuant to the RLUIPA; and that an injunction be entered in accordance with the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A)[15] which would allow Plaintiff to grow a 3-inch beard in accordance with his religious faith.

**IN CHAMBERS** at Tallahassee, Florida, on August 8, 2018.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other**

---

[15] *See* <u>Watkins v. Fla. Dep't of Corr.</u>, 669 F. App'x 982, 983 (11th Cir. 2016) (approving the injunction entered by this Court against the Secretary).

Case No. 4:16cv49-WS/CAS

parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u>  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.